cordingly, State Farm "had no duty to indemnify or defend [P]laintiff[s]." *Id.* at 1090.

2005 UT App 563

**STATE of Utah, in the interest of O.C., T.C., J.C., and C.C., persons under eighteen years of age.**

**S.C., Appellant,**

v.

**State of Utah, Appellee.**

**No. 20050185–CA.**

Court of Appeals of Utah.

Dec. 30, 2005.

Sharon S. Sipes, Law Office of Sharon Sipes, PC, Ogden, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Carol L.C. Verdoia, Asst. Atty. Gen., Salt Lake City, for Appellee.

Martha Pierce and Candace Coy–Dymek, Salt Lake City, Guardians Ad Litem.

Before BENCH, Associate P.J., DAVIS, and McHUGH, JJ.

## OPINION

BENCH, Associate Presiding Judge:

¶ 1 Appellant S.C. (Mother) challenges the juvenile court's findings that she neglected her adoptive and prospective adoptive children. Mother further challenges the finding that it is in the best interests of O.C., one of the prospective adoptive children, that the child be removed from the home and placed for adoption with another family. Mother contends that, as a prospective adoptive parent, she is entitled to legal custody of O.C. pursuant to Utah Code section 78–30–4.22(1). *See* Utah Code Ann. § 78–30–4.22(1) (2002). Mother also argues that she is entitled to reunification services pursuant to Utah Code section 78–3a–311. *See id.* § 78–3a–311 (2002). We affirm.

## BACKGROUND

¶ 2 Mother and her husband B.C. (Father) are the adoptive parents of J.C. and C.C., and the prospective adoptive parents of O.C. and T.C. Both O.C. and T.C. were born in early 2004 and were placed in the home separately through a private adoption and a licensed Utah adoption agency, respectively.

¶ 3 On May 24, 2004, Emily C., a relative of Father that provided day care for the children, discovered a "large squishy soft spot" on T.C.'s head. Emily contacted Father, who stated that T.C. had rolled off the bed earlier that day. Knowing that the baby was not old enough to roll over, Emily then contacted Mother and Donna M., a nurse, who examined T.C. At Donna's suggestion, Mother took T.C. to Primary Children's Medical Center (PCMC), where a doctor examined the child in the emergency room. The examination revealed that T.C. had suffered a large subdural hematoma on his head and a possible left rib fracture. The examining doctor believed that the head injury was the result of a severe impact and suspected that it might have been intentionally inflicted. The doctor spoke to Mother and Father about the doctor's concern that T.C. was being abused and indicated that she was going to make a referral to the Division of Child and Family Services (DCFS). The doctor instructed Mother and Father to take T.C. to the Safe and Healthy Families clinic at PCMC for follow-up chest x-rays within the next seven to ten days to confirm whether the rib was indeed fractured. Mother and Father did not return with T.C. for the follow-up x-rays within the prescribed time frame.

¶ 4 While at church on June 13, 2004, Mother asked Emily to look at T.C.'s arms. Emily observed the arms to be swollen and hot to the touch. Emily suggested that nurse Donna should look at T.C.'s arms. Donna observed the arms and told Mother to take T.C. immediately to an urgent care facility or a hospital emergency room. Donna also inquired about the follow-up x-rays requested by the PCMC doctor on May 24th. Mother indicated that she had not taken T.C. for the follow-up because she was too busy

with her work. Later, Mother told Donna that she had decided not to take T.C. to an emergency room because she had learned that the injury occurred when Father accidently dropped T.C. and grabbed him by the arms to prevent him from hitting the ground, and that T.C. was doing fine.

¶ 5 DCFS received two referrals on T.C.: the first on May 24, 2004, regarding the head and rib injuries, and the second on June 14, 2004, regarding the arm injuries. A child protective services (CPS) worker went to the home on June 15, 2004, along with a detective from the Salt Lake City Police Department. Both observed that T.C.'s arms were red, swollen, and rigid, and that the baby winced when they were touched. The CPS worker and the detective requested that T.C. be taken to PCMC for an emergency medical examination. Mother and Father refused, stating that Mother would take the child to their pediatrician the next day. Eventually, Mother and Father asked the CPS worker and the detective to leave the home, which they did. The CPS worker later returned with a warrant to take T.C. into protective custody, but the family had vacated their home during the night.

¶ 6 On June 16, 2004, Mother took T.C. to a pediatrician's office. Mother told the doctor that she thought T.C. had a "bug bite" from crawling on the grass. During the exam, the doctor discovered that T.C. had not been taken for the follow-up x-rays at PCMC. The doctor directed Mother to take T.C. to PCMC for the follow-up chest x-rays and also for x-rays of his arms. Mother complied.

¶ 7 The x-rays revealed that T.C.'s left sixth rib was broken, as suspected, and also revealed three right rib fractures and two broken arms. The PCMC doctor examined T.C. and concluded that his injuries were the result of nonaccidental or abusive trauma. The doctor's review of the two sets of x-rays indicated that all of the rib fractures likely took place seven to ten days prior to May 24,

2004, but that the arms were broken later in a second abusive trauma. A consultation with a radiologist indicated that the arms were broken sometime after May 24, but prior to June 2, 2004.[1] The CPS worker arrived shortly thereafter and took T.C. into protective custody. Mother stated that the other children were being cared for by friends, but refused to disclose their location or provide a phone number to the CPS worker. Later, the CPS worker sought a warrant for the removal of the other children because Mother refused to disclose their whereabouts and the CPS worker believed the other children were at risk of abuse.

¶ 8 On June 17, 2004, Father confessed to physically abusing T.C.[2] Subsequently, Mother obtained a protective order against Father. At a shelter hearing held on June 18, 2004, Mother disclosed the location of the other children. The State filed a verified petition as to all the children, seeking findings that T.C. was abused and that all four children had been neglected. T.C. was relinquished to DCFS's custody. The other children, including O.C., remained in Mother's custody under protective supervision of DCFS.

¶ 9 Following an adjudication hearing held on the State's verified petition, the juvenile court found that Mother knew or should have known that Father's explanations were incompatible with T.C.'s injuries and an infant's abilities. The court found that the swelling of both broken arms, the discoloration of the arms, the distress that T.C. experienced when his arms were touched, and the overall nature of the injuries "demanded that the infant be seen by a doctor immediately." Regardless of the cause of the injuries, the court found that a reasonable caretaker would have concluded that the arm injuries needed to be treated immediately. Mother admitted at the hearing that earlier action could have prevented the second abusive trauma. Based upon her explanations for

---

1. The juvenile court found that if Mother had arranged for the follow-up x-rays for T.C. as initially instructed, the physical abuse would have been identified and the second abusive trauma resulting in the broken arms would have been prevented.

2. Father later pleaded guilty to a second-degree felony count of child abuse and is currently incarcerated.

the failure to take T.C. for the follow-up examination ordered by the PCMC doctor, the court found that Mother's reasoning process was deficient. The court noted that Mother "did not take the baby to see a doctor until after the [baby's arms] were broken and not even then until she was pressured by a[CPS] worker and Police Detective."

¶ 10 The court found that T.C. was an abused child who had suffered nonaccidental physical harm inflicted by Father. The court also found that Mother neglected T.C. by failing to provide proper medical care, which resulted in T.C. suffering additional physical abuse. Finally, the court found that because T.C. was an abused and neglected child, the other children in the home, including O.C., were at risk of being abused or neglected.

¶ 11 Furthermore, the court determined that Mother's continued marital relationship with Father subjected the children to further risk of harm as "a matter of law." The court noted that Mother remains committed to Father, even though he intentionally inflicted severe abuse on T.C., and has shown Father deference even when under DCFS investigation.

¶ 12 In support of its order transferring custody of O.C., the court emphasized that the adoption of O.C. had not yet been completed. As Mother is a "person substantiated for neglect and still married and in love with the perpetrator" of physical abuse of T.C., the court ruled that it is "highly doubtful that a district court would approve a petition by [Mother] to adopt" O.C. The court held that

> [it] cannot leave [O.C.] in a home where in all likelihood she cannot be adopted. [O.C.] is approximately one year old.... All of the literature points to the need for early bonding for children and adoptive parents and the court notes the legislative mandate for the court and the state to quickly find permanency for children.... For these reasons the court finds that it is in [O.C.'s] best interests to be moved from [Mother's] home to a home pre-approved for adoption.

¶ 13 The court determined that it is unlikely that Mother would be allowed to adopt O.C. and that continuation in Mother's home "would be contrary to [O.C.'s] welfare and ... best interest." Ultimately, the court concluded that

> [i]t is in [O.C.'s] best interest and the [c]ourt finds good cause to remove [O.C.] from [Mother's] home and place her in the custody and guardianship of the Division of Child and Family Services where she can be placed for adoption and will not be at risk of abuse or neglect in the future.

¶ 14 The juvenile court ordered O.C.'s transfer to an approved adoptive home as soon as one could be identified. A week later, the State filed a motion to enforce the order based upon its approval of a prospective adoptive home. Following a hearing, the juvenile court stated that it would not be in O.C.'s best interests to be subjected to multiple relocations pending resolution of this appeal. The juvenile court therefore granted a stay of the order of transfer and denied the State's motion to enforce the transfer order.

¶ 15 At a later dispositional hearing, the juvenile court set a goal of adoption for O.C. and T.C. The court directed that O.C. remain in DCFS's legal custody, with physical custody to remain with Mother, while the matter is on appeal. Subsequently, the State and the Guardian ad Litem filed separate motions with this court, requesting that O.C. be transferred immediately. We granted the State's motion and vacated the juvenile court's stay order. Additionally, we temporarily remanded so the juvenile court could expeditiously arrange for the transfer of O.C. to an approved prospective adoptive home identified by DCFS.

## ISSUES AND STANDARDS OF REVIEW

¶ 16 Mother argues on appeal that the juvenile court erred because the evidence is insufficient to support the conclusion that she neglected any of the children. Mother also contends that the juvenile court erred because the evidence is insufficient to support the conclusion that it is in the best interests of O.C. that she be removed and placed for adoption. We "review the juvenile court's factual findings based upon the clearly erroneous standard." *In re E.R.,* 2001 UT App

66,¶ 11, 21 P.3d 680. "The clearly erroneous standard requires that if the findings are against the clear weight of the evidence, or if the appellate court is convinced that a mistake has been made, the findings will be set aside." *In re S.T.*, 928 P.2d 393, 398 (Utah Ct.App.1996).

¶ 17 Mother argues that she has legal custody of O.C., pursuant to Utah Code section 78–30–4.22(1), and that the juvenile court violated her constitutional and custodial rights by ordering the transfer of O.C. and failing to provide Mother with reunification services pursuant to Utah Code section 78–3a–311. *See* Utah Code Ann. §§ 78–3a–311, –30–4.22(1). The "[a]pplication of statutory law to the facts presents a mixed question of fact and law. We review the juvenile court's findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." *In re G.B.*, 2002 UT App 270,-¶ 11, 53 P.3d 963 (citation and quotations omitted). "Constitutional issues, including that of due process, are questions of law which we review for correctness." *In re K.M.*, 965 P.2d 576, 578 (Utah Ct.App.1998).

## ANALYSIS

### I.  Neglected Children

¶ 18 The juvenile court specifically found that Mother neglected T.C. and, as a result, neglected all of the children in the home. Mother argues that the evidence is insufficient to support this finding. We disagree.

¶ 19 A "neglected child," under Utah law, is a minor "who lacks proper parental care by reason of the fault or habits of the parent, guardian, or custodian," or "whose parent, guardian, or custodian fails or refuses to provide proper or necessary ... medical care ... or any other care necessary for health, safety, morals, or well-being." Utah Code Ann. § 78–3a–103(1)(s)(i)(C)–(D) (2002). The juvenile court found that "[i]n spite of numerous warning signs, inconsistent and implausible explanations by [Father], and [the numerous] requests by neighbors, the Division caseworker, and law enforcement, [Mother] failed to provide [T.C.] with appropriate parental care" and "necessary

medical care." We afford broad deference to the juvenile court's findings. The "juvenile court in particular is given a wide latitude of discretion as to the judgments arrived at based upon not only the court's opportunity to judge credibility firsthand, but also based on the juvenile court judges' special training, experience and interest in this field, and ... devoted ... attention to such matters." *In re E.R.*, 2001 UT App at ¶ 11, 21 P.3d 680 (alterations in original) (citation and quotations omitted). We are unconvinced that the juvenile court here ruled against the clear weight of the evidence in finding that Mother neglected T.C. by failing to provide him with adequate parental and medical care.

¶ 20 Furthermore, the definition of a "neglected child" includes a minor "who is at risk of being a neglected or abused child ... because another minor *in the same home* is a neglected or abused child." Utah Code Ann. § 78–3a–103(1)(s)(i)(E) (emphasis added). Consequently, Mother's actions in neglecting T.C. constitute neglect of all of the children in the home, including O.C.

### II.  Best Interests

¶ 21 The juvenile court also determined that it would be in O.C.'s best interests that she be removed from the home "and place[d] ... in the custody and guardianship of [DCFS,] where she can be placed for adoption and will not be at risk of abuse or neglect in the future." Without citing or referring to any law, Mother challenges the adequacy of the best-interests determination because the juvenile court did not make a specific finding that O.C.'s removal from the home would be in the best interests of "all of the children." In making a best-interests determination, however, the juvenile court is specifically directed to "tak[e] into consideration information provided to the court ... relating to the health, safety, and welfare *of the child* and the moral climate of the potential adoptive placement." Utah Code Ann. § 78–30–9(2) (2002) (emphasis added). The Utah Supreme Court has likewise stated that the "interest and welfare *of the child* be given paramount consideration in all cases involving the custody of children." *Taylor v.*

*Waddoups,* 121 Utah 279, 241 P.2d 157, 160 (1952) (emphasis added).

▮ ¶ 22 The factors involved in a best-interests determination may include the following:·

> [T]he preference of the child; keeping siblings together; the relative strength of the child's bond with one or both of the prospective custodians; and, in appropriate cases, the general interest in continuing previously determined custody arrangements where the child is happy and well adjusted. Other factors relate primarily to the prospective custodians' character or status or to their capacity or willingness to function as parents: moral character and emotional stability; duration and depth of desire for custody; ability to provide personal rather than surrogate care; significant impairment of ability to function as a parent through drug abuse, excessive drinking, or other cause; reasons for having relinquished custody in the past; religious compatibility with the child; kinship, including, in extraordinary circumstances, stepparent status; and financial condition. (These factors are not necessarily listed in order of importance.)

*Hutchison v. Hutchison,* 649 P.2d 38, 41 (Utah 1982) (footnotes omitted). Although a juvenile court may consider sibling togetherness as one of many factors in determining the best interests of the child, a collective finding for the best interests of all of the other children is not required.[3] Given the wide latitude of discretion afforded the juvenile court, we are unconvinced that the court went against the clear weight of the evidence in finding that it is in O.C.'s best interests that she be removed from the home and placed for adoption.

### III.   Procedural Due Process

▮ ¶ 23 As a prospective adoptive parent, Mother asserts that she is entitled to legal custody of O.C. once a petition for adoption is filed, pursuant to Utah Code section 78–30–4.22(1). *See* Utah Code Ann. § 78–30–4.22(1). For our purposes we will assume, without deciding, that Mother is entitled to legal and physical custody of O.C.[4]

¶ 24 Mother argues that because she had legal custody of O.C., Mother also had a constitutionally protected liberty interest, which was violated by O.C.'s removal. Although Mother does not specifically refer to due process in her appeal, the alleged deprivation of her protected liberty interests clearly implicates procedural due process.

¶ 25 "The Supreme Court has long recognized family relationships as one of the liberties protected by the due process clause of the fourteenth amendment." *Spielman v. Hildebrand,* 873 F.2d 1377, 1383 (10th Cir. 1989); *see also Smith v. Organization of Foster Families for Equal. & Reform,* 431 U.S. 816, 842, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). "For this reason, some kind of hearing is generally required before a person is deprived of a protected interest...." *Spielman,* 873 F.2d at 1385.

▮ ¶ 26 Utah case law is consistent with this analysis. "Under Utah law, persons with a special relationship to a child have a right to a hearing on adoption or custody matters." *In re H.J.,* 1999 UT App 238,¶ 32, 986 P.2d 115. We need not determine whether Mother was entitled to such a hearing because, in a four-day adjudication hearing, she was clearly provided an opportunity to be heard before the removal of O.C. We conclude that Mother was afforded due process similar to that of any parent. Therefore, there was no violation of procedural due process whether or not her status as a pro-

---

3.   O.C. is not biologically related to any of the other children and has not been legally adopted by Mother and Father. As a result, sibling togetherness is not a material factor in this matter.

4.   As we conclude that Mother has received procedural due process equivalent to that of any parent, we do not need to interpret Utah Code section 78–30–4.22(1) and its alleged application in this matter. *See* Utah Code Ann. § 78–30–4.22(1).

spective adoptive parent entitled her to comparable notice and hearing requirements afforded to natural parents.

## IV.  Reunification

¶ 27 Similarly, Mother argues that because she had legal custody of O.C., she was entitled to reunification services pursuant to Utah Code section 78–3a–311.  *See* Utah Code Ann. § 78–3a–311.  She argues that Father, not Mother, is the "offending parent" for purposes of section 78–3a–311(2)(a)(iii) and that she therefore should have been granted reunification services with O.C. *Id.* § 78–3a–311(2)(a)(iii).  We disagree.  Even if the adoption of O.C. had been finalized, Mother would not be entitled to reunification services, given the specific finding that she had neglected T.C. and the other children in the home, including O.C. Because Mother is an "offending parent," the juvenile court is under no duty or obligation to provide her with reunification services.  *Id.* Based on the juvenile court's findings that Mother neglected O.C., the juvenile court properly ordered that no reunification services would be provided.

## CONCLUSION

¶ 28 The juvenile court did not rule against the clear weight of the evidence in finding that Mother neglected T.C. and all of the other children in the home, and that it is in O.C.'s best interests that she be removed from the home and placed for adoption.  We also conclude that Mother was afforded procedural due process, similar to that of any parent, in the hearing held prior to O.C.'s removal.  Additionally, Mother is not entitled to reunification services under Utah law.

¶ 29 Accordingly, we affirm.

¶ 30 WE CONCUR:  JAMES Z. DAVIS and CAROLYN B. McHUGH, Judges.