**2021 UT App 134**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF J.P. AND T.P.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

T.L.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20210185-CA
Filed December 9, 2021

Fifth District Juvenile Court, Cedar City Department
The Honorable Troy A. Little
No. 1170183

Colleen K. Coebergh, Attorney for Appellant

Sean D. Reyes, John M. Peterson, and
Carol L. C. Verdoia, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1     After a two-day evidentiary hearing, the juvenile court terminated T.L.'s (Mother) parental rights regarding her two children, J.P. and T.P. (collectively, the Children). Mother now appeals, asserting that the court erred by concluding that termination of her parental rights was strictly necessary and in the Children's best interest. We affirm.

BACKGROUND

¶2      While married to her husband (Father), Mother had two children: J.P., a son born in 2013, and T.P., a daughter born in 2016. Mother described J.P. as "difficult to manage because he is autistic," and stated that he has a history of "aggressive and violent behavior," which he sometimes expressed toward T.P. Mother's marriage was "good at first," but Father eventually became violent and abusive toward both Mother and J.P., and was arrested on one occasion for domestic violence. In 2018, Mother went to live with her parents, taking the Children with her.

¶3      A few months later, J.P. sustained a black eye after Mother's father (Grandfather) threw a laundry basket at him. Grandfather "has a history of dangerous behavior" and was once arrested and convicted of attempted aggravated assault after discharging a firearm in the presence of the Children during a family dispute. After investigating the laundry basket incident, the Department of Child and Family Services (DCFS) made a supported finding of physical abuse against Grandfather and asked Mother to stop living with her parents; DCFS recommended that she stay at a women's shelter with the Children, and Mother complied.

¶4      During the stay at the shelter, DCFS again became involved after other residents of the shelter reported that Mother was physically abusing the Children and throwing their meals in the trash as a form of punishment. Following an investigation of these incidents, DCFS made a supported finding of physical abuse against Mother and took the Children into protective custody. The juvenile court later determined that the Children were abused and neglected, and set reunification with Mother as the primary permanency goal.

¶5      The Children were initially placed together with the same foster family. During this time, the foster parents reported that

J.P. was "physically aggressive, daily, toward[]" T.P. But in some ways, the Children did better in their new environment: T.P. was "excelling" and J.P. showed improvement after weekly therapy, although he continued to sometimes "act[] out aggressively."

¶6 During this same time period, Mother worked toward reunification by attending therapy and parenting courses, and by securing employment. In recognition of this progress, some nine months after their removal the Children were returned to Mother's custody for a trial home placement. But Mother still lived with her family, including Grandfather, and for various reasons the home placement failed; this time, DCFS removed the Children "due to concerns of environmental neglect, ongoing insufficient hygiene . . . , and suspicion of sexual reactiveness."

¶7 Following the failure of the trial home placement, the State and a guardian ad litem (the GAL) appointed to represent the Children's interests asked the juvenile court to change the permanency goal from reunification to adoption. The court granted that request and terminated reunification services; shortly thereafter, the State filed a petition to terminate Mother's parental rights to the Children.[1]

¶8 Meanwhile, J.P. was continuing to act aggressively toward T.P. and others, and DCFS eventually found it necessary to separate the Children, and place them with different foster families, in order to protect T.P. Some time later, Mother expressed "concern" about the separation to the juvenile court, but the court allowed it, crediting the GAL's account that J.P.'s behavior improved after the Children were separated.

---

1. The State's petition also asked the court to terminate Father's parental rights, which the court eventually did. Father's parental rights are not at issue in this appeal.

¶9 The case proceeded to trial on the State's petition to terminate Mother's parental rights. During trial, the State called eight witnesses in support of its case, including Mother, all the foster parents, certain DCFS caseworkers, and a peer parent advisor. In addition, the GAL addressed the court and proffered certain statements made by the Children. During closing argument, Mother's attorney did not contest the fact that statutory grounds existed for termination of Mother's parental rights, and acknowledged that "maybe returning the [Children] to [Mother's familial] home was not the best idea." Mother's attorney also recognized that J.P. had, at times, been violent and aggressive toward T.P., and agreed with the State that "these kids could not be together" in foster care. But Mother's attorney argued that, nevertheless, termination of Mother's parental rights was not in the Children's best interest, which he argued could best be served by returning them, together, to Mother's care. However, at no point did counsel argue, as an alternative to termination, that the court should grant permanent custody and guardianship to relatives or foster families.

¶10 After trial, the court issued a detailed written ruling terminating Mother's parental rights. The court found that six statutory grounds for termination existed, including abuse and neglect. And the court concluded that it was in the Children's best interest for Mother's parental rights to be terminated.

¶11 As part of its best-interest analysis, the court considered whether termination of Mother's parental rights was "strictly necessary," and it assessed whether other feasible options, short of termination, existed that would adequately address the situation, but ultimately concluded that termination was strictly necessary. The court noted that, at trial, it had been presented with only two options: terminating Mother's parental rights, or returning the Children to Mother's care. Nonetheless, the court proceeded to consider other potential options; in particular, the court examined at length whether a permanent guardianship with a relative or with a foster family would be appropriate.

With regard to a kinship placement, the court noted that the only known relatives were Mother's family members, including Grandfather, who all lived in the same household, and the court concluded that, in light of the situation, including Grandfather's history of violence, such a placement would be inappropriate. And with regard to long-term guardianships with foster families, the court offered its view that such arrangements tend to work well only "where the child has a healthy relationship with both the guardian and the parent" and "the guardian and parent are willing to work together to preserve that parent-child relationship." In this case, the foster families had "little to no relationship" with Mother. The court also noted that the Children were "very young," and concluded that "[t]hey both need stability and permanency" that could best be found in an adoption arrangement rather than in a guardianship arrangement. After an extensive analysis, the court determined that neither a kinship placement nor a long-term guardianship with foster families was an appropriate option in this case, and that adoption following termination of parental rights was the option most in keeping with the Children's best interest. Based on those findings and conclusions, the court terminated Mother's parental rights.

ISSUE AND STANDARD OF REVIEW

¶12    Mother now appeals from that order, and challenges the juvenile court's ruling that termination of her parental rights was strictly necessary and in the Children's best interest. "Whether the juvenile court correctly concluded there was no feasible alternative to terminating Mother's . . . parental rights is a mixed question of fact and law," and "we review the juvenile court's findings of fact for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." *See In re G.D.*, 2021 UT 19, ¶ 37, 491 P.3d 867 (quotation simplified); *see also In re J.M.*, 2020 UT App 52, ¶ 24, 463 P.3d 66 ("We afford a juvenile court's best-interest decision a

high degree of deference, reversing only for clear error, which we find when the result is against the clear weight of the evidence or leaves us with a firm and definite conviction that a mistake has been made . . . ." (quotation simplified)).

ANALYSIS

¶13    A court may terminate parental rights only after making two necessary findings. *In re N.K.*, 2020 UT App 26, ¶ 21, 461 P.3d 1116. First, the court must find, by clear and convincing evidence, that at least one statutory ground for termination exists. *See In re T.E.*, 2011 UT 51, ¶ 17, 266 P.3d 739; *see also* Utah Code Ann. § 80-4-301(1) (LexisNexis Supp. 2021). "Second, the court must find that termination of the parent's rights is in the best interest[] of the child." *In re N.K.*, 2020 UT App 26, ¶ 21 (quotation simplified); *see also* Utah Code Ann. § 80-4-104(12) (LexisNexis Supp. 2021).

¶14    The best interest of the child is "of paramount importance in determining whether termination of parental rights shall be ordered." Utah Code Ann. § 80-4-104(12)(a). Because any number of factors can have bearing on the child, the best-interest inquiry is a broad-ranging, "holistic examination of all the relevant circumstances that might affect a child's situation." *In re H.F.*, 2019 UT App 204, ¶ 14, 455 P.3d 1098 (quotation simplified). And this requires evaluating "the unique and specific conditions" experienced by the child, from the child's perspective. *In re J.M.*, 2020 UT App 52, ¶ 37, 463 P.3d 66. While courts have identified factors relevant to the best-interest determination, the list is non-exhaustive. *See id.* ("The breadth of this subjective assessment based on the totality of the circumstances surrounding the child has never been diminished . . . ." (quotation simplified)); *see also In re H.F.*, 2019 UT App 204, ¶ 14 (listing possible factors to consider in evaluating a child's best interest).

¶15    In addition, our legislature has directed that parental rights may be terminated only when that outcome is "strictly necessary" from "the child's point of view." *See* Utah Code Ann. § 80-4-301(1); *see also id.* § 80-4-104(12)(b). Our supreme court has interpreted this instruction as requiring that termination "be strictly necessary to promote the child's best interest," and has held that the "strictly necessary" inquiry is to be conducted "as part of" the best-interest inquiry. *In re B.T.B.*, 2020 UT 60, ¶¶ 60, 76, 472 P.3d 827. Termination is "strictly necessary" only when, after exploring possible placements for the child, the juvenile court concludes that no "other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights." *Id.* ¶ 67 (quotation simplified). "If the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary." *Id.* ¶ 66.

¶16    In this case, after finding that six different statutory grounds for termination existed and that termination was in the Children's best interest, the juvenile court terminated Mother's parental rights. As noted, this case is not about the statutory grounds for termination—Mother did not contest the presence of statutory grounds at trial, and does not appeal the court's findings in that regard. But Mother does challenge the court's conclusion that termination of her parental rights was in the Children's best interest and, in so doing, asks us to consider two issues. First, Mother argues that the court, in evaluating best interest, failed to adequately consider the customary preference for keeping siblings together, and failed to consider the impact that termination would have on the sibling bond.[2] Second,

---

2. The State asserts that Mother did not properly preserve this argument for appellate review. The State's contention is not particularly persuasive. Indeed, at trial, although acknowledging that the Children needed to be separated if they remained in foster care, Mother's attorney argued that the Children could be

(continued…)

Mother takes issue with the court's conclusion that terminating her rights was strictly necessary to promote the Children's best interest; specifically, she contends the court did not adequately address whether permanent guardianship with nonrelatives presented a viable option. We discuss each argument in turn.

¶17 Among the many "factors involved in a best-interest[] determination" is consideration of whether to "keep[] siblings together." *See In re O.C.*, 2005 UT App 563, ¶ 22, 127 P.3d 1286 (quotation simplified); *cf.* Utah Code Ann. § 80-3-409(3)(b) (LexisNexis Supp. 2021) (stating that, in making permanency decisions, juvenile courts should "attempt to keep the minor's sibling group together" where "practicable" and where that outcome is "in accordance with the best interest of the minor"). Mother contends that the court "did not appropriately weigh and consider the negative impact that termination of parental rights of the mother had on the sibling bond." We disagree.

¶18 In making its best-interest determination, the juvenile court quite clearly evaluated the impact termination would have on the Children's sibling relationship. In its findings, the court found it "necessary to address" the fact that the Children were "not placed together in the same adoptive home," and noted at the outset of its analysis the general preference for the "sibling group [to] stay together." But the court also noted that "this is a particularly unique situation wherein [J.P.] has a history of aggressive and violent behavior toward[] [T.P.]," and would

(…continued)

kept together if they were returned to Mother's care, and advanced this as a reason not to terminate. But we need not discuss preservation further here because, in this case, the issue "can easily be resolved *in favor of the party asserting that the claim was not preserved*," and therefore we elect to simply address the claim on its merits. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415.

"direct his anger at [T.P.] by hitting, kicking, and biting her." The court referenced testimony by caseworkers, foster parents, and a mental health evaluator who had each "witnessed [J.P.'s] aggression" toward T.P., and the court referred to J.P.'s aggression as a "safety risk" to T.P. And in particular, the court addressed Mother's argument that she could do better than the foster parents had done in this regard, offering its view that Mother "seem[ed] unaware of the severity of [J.P.'s] aggression" toward T.P. and that Mother was "minimizing" J.P.'s aggressive behavior. After considering the evidence, the court expressly found that "it is not practicable and it is not in the Children's best interest to keep" them together.

¶19    In light of these detailed findings and conclusions, it is simply not accurate to suggest that the juvenile court did not consider the "sibling bond" factor as part of its best-interest analysis. The court clearly did consider it. Mother's complaint, properly viewed, is not that the court did not consider the issue; rather, Mother's dissatisfaction lies with the weight the court gave her perspective, and with the court's ultimate conclusion. We have often stated that "it is not within our purview to engage in a reweighing of the evidence" heard by a court following a trial, even in cases in which "the evidence could also have supported" an alternative outcome. *See Shuman v. Shuman*, 2017 UT App 192, ¶¶ 9–10, 406 P.3d 258 (quotation simplified). Where a juvenile court has analyzed an issue following an evidentiary hearing, and has made factual findings and legal conclusions that are supported by the evidence and the law, we will not overturn those findings and conclusions, even if a different judge might have weighed the evidence in a different way. *See In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (stating that, when a "foundation for" a juvenile court's "decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence"); *see also In re J.E.G.*, 2020 UT App 94, ¶ 24, 468 P.3d 1048 ("Given the factfinder's advantaged position in observing the witnesses firsthand, it is the factfinder's responsibility, not the appellate court's, to weigh [the] evidence

and make a determination of fact." (quotation simplified)). Here, the court's analysis regarding the importance of the Children's sibling bond was supported by the evidence presented at trial, and we will not engage in a reweighing of that evidence on appeal. On that basis, we reject Mother's argument that the juvenile court, in evaluating best interest, failed to adequately consider and weigh the "sibling bond" factor.

¶20 Next, Mother asserts that the juvenile court, as part of its "strictly necessary" assessment, "did not appropriately consider permanent custody and guardianship" of the Children with nonrelatives. We reject this argument for similar reasons: the court did in fact consider this issue, and Mother's disagreement with the court's conclusion is not grounds for reversal.

¶21 In this case, the juvenile court devoted eight paragraphs of its analysis to this issue, despite the fact that Mother, at trial, did not specifically ask the court to assess permanent guardianship options with nonrelatives.[3] The court noted, at the

---

3. For this reason, the State argues that Mother did not preserve this issue for our review. We acknowledge the State's point that a litigant, if it wants a court to afford specific relief, should ask for that relief directly. But as the State acknowledges, "Utah law places an affirmative onus" on juvenile courts to "consider reasonable alternatives to termination." (Citing *In re B.T.B.*, 2020 UT 60, ¶ 74, 472 P.3d 827.) In this situation, juvenile courts have an independent obligation, imposed by statute, to assess whether termination is strictly necessary. *See In re B.T.B.*, 2020 UT 60, ¶ 74 (explaining that the juvenile court is "require[d] . . . to find, on the record, that no other option can achieve the same welfare and best interest for the child"); *see also* Utah Code Ann. § 80-4-301(1) (LexisNexis Supp. 2021). While the court's assessment in this regard is of course guided by the parties' arguments and specific requests for relief, a juvenile court must always make a finding, prior to terminating a parent's rights,

(continued…)

outset of its analysis, that the "only options presented at trial from the parties were to terminate Mother's parental rights or return the Children" to Mother. But despite the fact that the parties did not advance other alternatives, the court explored them anyway. In particular, the court noted that, "another option, short of termination," was to place the Children in a permanent guardianship with a relative. In this regard, the court noted that "DCFS made diligent efforts to locate possible" kinship placements, but did so "without success," because "the only known kin" were Mother's relatives, including Grandfather, who all lived together in the same household, a placement that had already proved itself inappropriate. Accordingly, the court concluded that a permanent guardianship with a relative "is not an option in this case."

¶22 The court then proceeded to assess whether a long-term guardianship with a nonrelative was a viable option. The court noted that "the obvious choice" for such a placement "would be a possible guardianship placement with the current" foster families. But the court offered its view that long-term guardianship arrangements are "typically only in a child's best interest where the guardians and the parent have a working, relatively healthy relationship" in which they are both "willing to work together to preserve [the] parent-child relationship," and "where the child has a healthy relationship with both the guardian and the parent." The court also opined that long-term guardianships work best with older children who have "the developmental maturity to recognize the guardian in their role and the parent in their role," and "can distinguish between the

---

(…continued)

that termination is strictly necessary to promote the child's best interest. In this case, we commend the juvenile court for its thorough analysis of the issue, even in the absence of any specific request by Mother for imposition of a long-term guardianship with nonrelatives.

two." The court found that none of these conditions were present here: the foster families had "little to no relationship whatsoever with Mother," and the Children were "still very young" and needed "stability and permanency" and "a family they can call their own without further changes." Accordingly, the court concluded that a long-term guardianship with a nonrelative did "not promote [the Children's] best interest or welfare," and that "[h]aving a permanent family unit [would] meet their best interest far better than a guardianship."

¶23   In light of the thorough treatment the juvenile court gave the issue, Mother's complaint that the court "did not appropriately consider" permanent guardianship options is unavailing. In this context as well, Mother is simply dissatisfied with the manner in which the juvenile court weighed the evidence and, as noted, this complaint has no traction on appeal. *See In re B.R.*, 2007 UT 82, ¶ 12; *cf. State v. Littlejohn*, 2021 UT App 73, ¶ 28, 496 P.3d 726 (stating that, where "it is apparent . . . that [the court] did consider the information" the appellant claimed it did not consider, the appellant's complaint was merely "that the court failed to give that information the weight [the appellant] believes it should have been given," and concluding that this "argument simply has no traction on appeal"). On this basis, we reject Mother's argument that the court failed to adequately consider potential long-term guardianship options with nonrelatives.

CONCLUSION

¶24   The juvenile court appropriately considered whether to keep the Children together, and whether long-term guardianship options existed short of termination. For the reasons stated, we reject Mother's challenges to the juvenile court's best-interest determination, and affirm the court's order of termination.

———————