2023 UT App 75

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF K.R. AND R.B.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

R.S.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Per Curiam Opinion
No. 20230255-CA
Filed July 13, 2023

Third District Juvenile Court, Salt Lake Department
The Honorable Monica Diaz
No. 1207437

Kelton Reed and Lisa Lokken
Attorneys for Appellant

Sean D. Reyes, John M. Peterson, and Carol L.C.
Verdoia, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

Before JUDGES MICHELE M. CHRISTIANSEN FORSTER, DAVID N.
MORTENSEN, and AMY J. OLIVER.

PER CURIAM:

¶1 R.S. (Mother) appeals the juvenile court's order terminating her parental rights with respect to K.R. (Brother) and R.B. (Sister) (collectively, the children). Mother alleges the juvenile court exceeded its discretion in determining that it was strictly necessary to terminate her rights rather than awarding permanent custody and guardianship to the children's maternal grandmother (Grandmother). We affirm.

¶2 In January 2022, the Department of Child and Family Services (DCFS) received a report that Mother was using drugs and neglecting Sister, who was an infant at the time. Four-year-old Brother was already living with Grandmother, and DCFS soon placed Sister with Grandmother as well.

¶3 Following a disposition hearing, the Court set a primary goal of reunification and set up a child and family plan. Mother received an initial substance abuse and mental health assessment but made no progress toward receiving treatment. She took only five of ninety-six required drug tests and tested positive on all five.

¶4 Nevertheless, Mother continued to demonstrate an attachment to the children. She participated in visits with the children on a bi-weekly basis, although she did miss some visits and had not seen the children for several weeks prior to the termination trial. The visits were supervised by a DCFS caseworker (Caseworker), and the children had to travel six-and-a-half hours round trip to attend. On some occasions, Mother cancelled visits without notifying Grandmother, leading the children to make the trip unnecessarily. Brother became upset when Mother missed visits with him.

¶5 Early on, Caseworker observed Mother having "inappropriate conversations" with Brother regarding Grandmother, such as telling him that Grandmother was not properly caring for him. Caseworker would redirect Mother to more appropriate topics, and "with reminders, this behavior . . . stopped." Mother engaged with the children during visits and planned activities for them to do together.

¶6 Grandmother and Mother used to have a good relationship, but it had deteriorated due to Mother's drug use and the DCFS case. According to Grandmother, Brother's behavior would "deregulate[] for a couple days" after visits with Mother and he would become belligerent toward Grandmother. Mother

would send Grandmother insulting text messages, and she had trouble respecting boundaries Grandmother set. Both women indicated they would not be comfortable "co-parenting" with one another.

¶7 Following the termination trial, the juvenile court found several grounds for termination, which Mother does not challenge on appeal. The court then turned to the best interest analysis, including the question of whether termination of parental rights was strictly necessary.

¶8 The court considered whether awarding permanent guardianship to Grandmother was an alternative to termination that could "equally protect and benefit the children." However, the court ultimately determined that termination was strictly necessary for the following reasons:

- Mother and Grandmother "do not have a relationship" and are "unable to communicate regarding the children's needs and wellbeing." And while Grandmother attempts to set reasonable boundaries, Mother does not respect them. Mother herself acknowledged that "having her and [Grandmother] co-parent would not be healthy for the children."

- Mother had a history of making inappropriate comments regarding Grandmother to Brother during parent time. These comments led Brother to become belligerent toward Grandmother following visits. Although Mother had stopped making such comments at the direction of Caseworker, the court was concerned that she would "revert to making these comments, without the oversight of the Division." The court found that pitting the children against their caregiver in this way was "unhealthy" for their "emotional development and wellbeing."

- Visits with Mother "are emotionally hard on the children." Brother experiences behavioral problems after visits with Mother.

- The children have to travel six-and-a-half hours round trip to visit Mother. Because Mother does not communicate with Grandmother, she does not let her know when she is unable to attend visits. This has led the children to "endure the travel time needlessly." Additionally, it is emotionally hard on Brother when Mother misses visits. The long travel time, emotional harm due to missed visits, and Mother's inability to communicate with Grandmother combine to undermine the children's stability. "They need to know that their relationships are stable and that they can count on the adults in their lives. . . . [Mother] missing visits undermines and disregards the children's psychological and emotional security."

- The children are happy and thriving in Grandmother's care. She addresses their physical, mental, developmental, and emotional needs. The children are bonded to their extended family, which consists of Grandmother's husband and other children living in Grandmother's home. The children "need a permanent home," and "[f]rom the children's point of view, that home is [Grandmother's] home."

Based on these factors, the court found that termination of Mother's parental rights was "strictly necessary from the children's point of view."

¶9 Mother challenges the juvenile court's determination that termination of her rights was strictly necessary. "Whether a parent's rights should be terminated presents a mixed question of

law and fact." *In re B.W.*, 2022 UT App 131, ¶ 45, 521 P.3d 896 (quotation simplified), *cert. denied*, 525 P.3d 1269 (Utah 2023). "We will overturn a termination decision only if the juvenile court either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *Id.* (quotation simplified).

¶10    Mother asserts (1) that the court did not appropriately weigh certain evidence and (2) that the court inappropriately focused on the needs of the adults rather than the children by basing its decision on Mother and Grandmother's inability to "coparent" the children.

¶11    Before terminating a parent's rights, the court must find that termination is "strictly necessary to promote the child's best interest." *In re B.T.B.*, 2020 UT 60, ¶ 60, 472 P.3d 827. And this analysis must be undertaken from the child's point of view. *See* Utah Code § 80-4-301(1); *In re B.T.B.*, 2020 UT 60, ¶ 64. "Termination is strictly necessary only when, after exploring possible placements for the child, the juvenile court concludes that no other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights." *In re J.P.*, 2021 UT App 134, ¶ 15, 502 P.3d 1247 (quotation simplified). "If the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary." *Id.* (quotation simplified).

¶12    The strictly necessary analysis "is designed to ensure that the court pause long enough to thoughtfully consider the range of available options that could promote the child's welfare and best interest." *In re B.T.B.*, 2020 UT 60, ¶ 69. "[I]f a court has complied with its statutory obligations, its resultant best interest determination is entitled to deference." *In re B.W.*, 2022 UT App 131, ¶ 69. Thus, a parent's mere dissatisfaction "with the manner

in which the juvenile court weighed the evidence . . . has no traction on appeal." *In re J.P.*, 2021 UT App 134, ¶ 23.

¶13 Mother argues that the court's finding that Brother was upset when she missed visits should weigh against a finding that termination was strictly necessary. She also asserts that the court should have given more weight to her recent history of stopping her inappropriate comments to Brother rather than inferring that she was likely to resume such comments in the future. These arguments ultimately take issue with "the manner in which the juvenile court weighed the evidence" rather than its compliance with its statutory mandate. *See id.* The court's findings are entitled to deference, and we will not disturb them on appeal. *See In re B.W.*, 2022 UT App 131, ¶ 69.

¶14 Mother next asserts that the court's focus on her and Grandmother's inability to "co-parent" the children was inappropriate and led it to consider the strictly necessary analysis from the adults' perspective rather than the children's perspective. *See* Utah Code § 80-4-301(1) (dictating that the strictly necessary analysis must be undertaken from the child's point of view). Mother argues that a permanent custody and guardianship order does not result in "co-parenting" but rather involves "the Guardian call[ing] the shots" while "the parent has a handful of residual rights." We take Mother's point that co-parenting may not have been quite the right term to use in describing the relationship between a parent and a permanent guardian.[1] However, we are more concerned with the substance of the

---

1. Nevertheless, as the guardian ad litem observes, it is not apparent from the record that Mother was "up to the tasks involved with residual parental rights," given that she has not paid child support, has not respected the boundaries Grandmother has put in place, has not progressed past supervised visitation, and has disappointed the children by failing to communicate about missed visits.

court's analysis than the term it used. And that analysis indicates that the court's true concern was whether it was in the children's best interests to be pitted between a parent and guardian who could neither cooperate nor communicate with one another.

¶15   "[L]ong-term guardianship arrangements are typically only in a child's best interest where the guardians and the parent have a working, relatively healthy relationship in which they are both willing to work together to preserve the parent-child relationship and where the child has a healthy relationship with both the guardian and the parent." *In re J.P.*, 2021 UT App 134, ¶ 22 (quotation simplified). Thus, when a parent and guardian have "little to no relationship," the particular circumstances of the case may indicate that permanent custody and guardianship will not meet the children's needs as well as termination of parental rights. *See id.* That is what the juvenile court found here, and such a finding was not an abuse of its discretion under the circumstances.

¶16   Furthermore, we are not convinced that the juvenile court inappropriately conducted the strictly necessary analysis from the adults' point of view rather than that of the children. The court explicitly discussed the effect Mother and Grandmother's inability to cooperate had on the children, finding that being put in the middle of the conflict was "unhealthy" for the children's "emotional development and wellbeing" and undermined their stability, that the children suffered when Mother did not communicate with Grandmother about missing visits, and that Mother herself acknowledged that the conflict was "unhealthy" for the children. These findings indicate that the court considered the conflict between Mother and Grandmother from the children's point of view in determining that the conflict made termination of Mother's rights strictly necessary.

¶17   The juvenile court here carefully considered whether the children could be equally benefited and protected by a permanent

custody and guardianship arrangement as opposed to termination of Mother's parental rights. It also made detailed findings in support of its determination that termination was strictly necessary from the children's point of view. Accordingly, the juvenile court's decision to terminate Mother's parental rights is affirmed.

————