**2022 UT App 131**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF B.W., J.W., AND N.W.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

H.W.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20210886-CA
Filed November 17, 2022

Eighth District Juvenile Court, Duchesne Department
The Honorable Jeffry Ross
No. 1182864

Emily Adams and Sara Pfrommer, Attorneys
for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

TENNEY, Judge:

¶1      In December 2019, H.W. (Mother) gave birth to twins, J.W. and N.W. (collectively, the Twins). At the hospital, Mother tested positive for methamphetamine, as did the Twins' umbilical cords. The Division of Child and Family Services (DCFS) soon began providing protective supervision services to Mother, the Twins, and B.W., Mother's one-year-old son. After Mother repeatedly

failed drug tests, the juvenile court placed B.W., J.W., and N.W. (collectively, the Children) in DCFS custody.

¶2     Mother continued to struggle with illegal drug use, and the court terminated reunification services in May 2021. Mother was then treated in an inpatient treatment facility from May through August 2021. After leaving this treatment facility, Mother again relapsed, using methamphetamine several times in the ensuing weeks. At the close of a termination hearing in November 2021, the court terminated Mother's parental rights in the Children.

¶3     Mother now appeals the termination decision, arguing that there was not clear and convincing evidence (1) that any ground for termination existed or (2) to support the court's best interest determination. As set forth below, however, there was enough evidence on both fronts. We accordingly affirm the challenged rulings.

BACKGROUND

*DCFS Petitions for Protective Supervision*

¶4     In December 2019, when B.W. was one year old, Mother gave birth to the Twins. At the time of their birth, Mother tested positive for "methamphetamine and amphetamines." The Twins' umbilical cords also tested positive for methamphetamine and amphetamines. Mother claimed that "she didn't know why or how she could have tested positive unless it was her e-cigarette."[1]

---

1. When the Twins were born, Mother was living with the Children's alleged father. The alleged father participated throughout the proceedings, and at the close of the same termination proceeding at issue in this appeal, the juvenile court terminated his rights, if any, in the Children. In a separate appeal,

(continued…)

¶5 Based on the positive drug tests, DCFS filed a verified petition for protective supervision services a few weeks after the Twins' births. In that petition, DCFS alleged that the Children were abused and neglected based on the Twins' fetal exposure to illegal drugs.

¶6 Mother responded pursuant to rule 34(e) of the Utah Rules of Juvenile Procedure, meaning that she neither admitted nor denied the allegations but accepted that the allegations would "be deemed true." *See* Utah R. Juv. P. 34(e). Based on Mother's rule 34(e) response, the juvenile court found that the Twins had been exposed to illegal drugs and that all the Children were abused and neglected by Mother. The juvenile court accordingly ordered DCFS "to provide protective supervision services to the family" and to develop a child and family plan.

¶7 With Mother's input, DCFS then created a child and family plan. The plan listed several responsibilities for Mother, such as maintaining a residence appropriate for the Children, completing a mental health and substance abuse assessment, submitting to random drug testing, and making daily calls to the Treatment Assessment Screening Center (TASC) system.

---

this court upheld that decision based on the alleged father's failure to establish paternity. *See* Order, Case No. 20210915-CA (Feb. 18, 2022).

Mother was married to another man when each of the Children were born. This made him their presumptive father under the Utah Uniform Parentage Act. *See* Utah Code Ann. § 78B-15-204(1)(a) (LexisNexis 2018). But although this man was properly served, he never appeared. The juvenile court thus determined that he had abandoned the Children and terminated his parental rights as well. That portion of the court's order is not at issue in this appeal.

¶8     The court held a disposition hearing less than one month after it adjudicated the Children as abused and neglected. At that hearing, DCFS reported that Mother had not been calling into the TASC system or completing drug tests. The guardian ad litem moved for the Children to be taken into DCFS custody, but the court declined that request and instead again ordered Mother to comply with the plan. The court also scheduled a thirty-day review hearing.

*DCFS Petitions for Custody*

¶9     Over the next month, "Mother failed to call into TASC 7 times, missed 3 drug tests, and tested positive for methamphetamines on two occasions." As a result, on April 16, 2020, DCFS filed an expedited verified petition for custody.

¶10    About a week later, the juvenile court held a pretrial hearing on the custody petition. Mother entered a rule 34(e) response, and the court again determined that Mother had abused and neglected the Children. The court also found that DCFS had made "[r]easonable efforts" to "prevent the removal of" the Children but that those "efforts were unsuccessful." The court thus ordered the Children to be removed from Mother and placed in the temporary custody of DCFS.

¶11    The court held a disposition hearing the following month. At that hearing, the court ordered Mother to comply with a newly created child and family plan, which contained "essentially the same provisions as the previous one," including the requirements noted above. The court also ordered DCFS to provide reunification services, acknowledging that reunification was "the primary goal."

*Mother Requests Placement with Grandparents*

¶12    At the pretrial and disposition hearings (and, as will be discussed, at subsequent hearings in the case as well), Mother

requested that the Children be placed with her mother (Grandmother) and stepfather (Step-Grandfather) (collectively, Grandparents). After Mother made this request, however, the State notified the court that Step-Grandfather was unable to pass a DCFS background check. The record lacks some of the specifics regarding this background check, but it does show that DCFS informed the court that Step-Grandfather was unable to pass it because there were five cases against him in the Licensing Information System (LIS). The LIS is a "sub-part of the Management Information System," a database that DCFS is statutorily required to maintain.[2] Utah Code Ann. § 62A-4a-1006(1) (LexisNexis Supp. 2021). For an individual to be included in the LIS, DCFS must make "a supported finding" that the individual committed "a severe type of child abuse or neglect." *Id.* § 62A-4a-1005(1); *see also id.* § 62A-4a-1006(1)(b).

¶13 DCFS gave information to Step-Grandfather about how to appeal the LIS cases. After he did, three of the cases were administratively overturned.[3] But the remaining two were upheld

---

2. The Management Information System "contain[s] all key elements of each family's current child and family plan" and "alert[s] caseworkers regarding deadlines for completion of and compliance with policy, including child and family plans." Utah Code Ann. § 62A-4a-1003(3)(a), (b) (LexisNexis Supp. 2021).

Effective September 1, 2022, several sections relevant to the LIS were repealed and renumbered. *Compare id.* §§ 62A-4a-101, -1005, -1006, *with id.* §§ 80-2-102, -708, -1002 (Supp. 2022). We cite to the versions in effect at the time of the termination hearing.

3. Although not entirely clear from the record, it appears that it was DCFS that administratively overturned three of the LIS cases against Step-Grandfather. *See generally* Utah Code Ann. § 62A-4a-1005(3)(i) (explaining that "the alleged perpetrator" may "file a written request asking [DCFS] to review the findings made").

because they "were of such significance that they [could not] be overturned."

¶14 Even so, Mother still requested that the Children be placed with Grandparents. Over the course of several hearings, Grandmother informed the court that Step-Grandfather was only home one day every week, that the LIS cases in question were from "[a]bout 20 years ago," and that Step-Grandfather was "never charged with sexual abuse." Nonetheless, the court repeatedly decided against placing the Children with Grandparents.[4]

*Juvenile Court Terminates Reunification Services*

¶15 For the remainder of 2020, Mother struggled to comply with the new child and family plan. For example, although Mother successfully completed a mental health and substance abuse assessment, she "struggled for the first several months to fully engage in the therapy that was recommended for [her], with attendance being very sporadic and inconsistent." On December 1, 2020, Mother was scheduled to check into an inpatient treatment facility. But when the DCFS caseworker went to pick her up, "Mother did not answer the door and missed her appointment to check in." Mother belatedly went to the treatment facility the following week, but on arrival, she tested positive for methamphetamine. When the facility offered to accept Mother despite the positive drug test, she "refused to enter." After learning of these events, the court ordered Mother to be jailed if she was not in an inpatient treatment facility by December 23,

---

4. The Children were initially placed in the care of a foster mother. When the foster mother was no longer able to care for all the Children, the Twins went to live with another foster family. In either April or May 2020, all the Children went to live with a new foster family, where they remained through the duration of the proceedings.

2020. Mother checked into a facility on December 23, but she left two days later.

¶16 In February 2021, Mother gave birth to another child, A.W. Shortly after A.W.'s birth, DCFS removed him from Mother's care via warrant. He was returned to Mother's custody once his umbilical cord test came back showing no presence of illegal drugs. But the court ordered Mother to "strictly comply with the court's drug testing orders going forward, or A.W. would likely be removed from [her] custody again." In April 2021, the court removed A.W. from Mother's custody based on Mother's "ongoing drug testing issues."[5]

¶17 The court held a permanency hearing for the Children in May 2021. At that hearing, the court found that DCFS had made "[r]easonable efforts" to provide reunification services and that Mother "partially complied with the requirements of the service plan." But the court stated that it could not find that Mother had "the strength to stay away from drugs with the [Children] in the home." In support of this, the court detailed the many times that Mother had tested positive for illegal drugs or had failed to test at all. The court further determined that it could not extend reunification services for the Children, so it changed their final permanency plan to adoption.[6]

---

5. The termination decision at issue in this appeal applied only to Mother's parental rights in the Children. But because the juvenile court's decision in this case was partly based on Mother's choices while pregnant with A.W., we include those relevant facts.

6. Unless a statutory exception applies, "the juvenile court may not extend reunification services beyond 12 months after the day on which the minor is initially removed from the minor's home." Utah Code Ann. § 80-3-409(6) (LexisNexis Supp. 2022). As the

(continued…)

*Mother Enters an Inpatient Treatment Facility*

¶18 From May 3, 2021, through August 31, 2021, Mother received inpatient drug treatment. Although she tested positive for methamphetamine when she arrived, she reportedly did very well in the program and remained drug-free throughout her stay. Before leaving treatment, Mother told a caseworker that she no longer wished to live with the alleged father because he was also struggling to stay clean. But when Mother left the facility, "she almost immediately" started living with the alleged father again and "very quickly relapsed on methamphetamine." Mother later testified that in the two months after she left the facility, she had "3 relapses and 5 methamphetamine uses."

*Juvenile Court Terminates Mother's Parental Rights*

¶19 On June 15, 2021, the State filed a verified petition for termination of Mother's parental rights. The court held a termination hearing on November 1, 2021, and the parties stipulated to present the evidence by proffer and have the witnesses available for cross-examination. In support of its petition, the State proffered the testimony of two DCFS caseworkers, and those caseworkers also appeared in court for live cross-examination. The State also offered, and the court received, the caseworkers' case notes. The Children's current foster mother (Foster Mother) testified in person.

¶20 The first DCFS caseworker (Caseworker 1) had worked with the family from the Twins' births until December 2020. The State proffered that she would have testified about DCFS's unsuccessful efforts to place the Children with relatives, Mother's

juvenile court later explained in its termination decision, Mother was provided with separate reunification services with respect to A.W., so she was provided "'additional' services and 'additional' time to remedy the safety concerns that brought the [Children] in this matter into DCFS custody."

supervised visits with the Children, and Mother's efforts to comply with the plan, including drug testing and participation in therapy. Caseworker 1 also would have discussed how she arranged to take Mother to an inpatient treatment facility and how Mother did not answer the door when Caseworker 1 arrived.

¶21 On cross-examination, Mother's counsel asked how Mother interacted with the Children during the supervised visits. Caseworker 1 responded that Mother was "very engaging" with the Children and that the "visits went very well." Caseworker 1 also agreed that Mother clearly loved the Children. When Counsel asked if Mother was a "good and appropriate parent[]" "but for the drug use," Caseworker 1 replied, "Yes, except for the drug use." Counsel also asked about her observations of Mother's home. Caseworker 1 responded that "[m]ost of the time, [she] was just in the living room" and that she "did not see any drugs or paraphernalia."[7] Caseworker 1 also agreed that before the Children were removed from Mother's custody, she never observed them to be without proper food, clothing, supervision, affection, or medical care.

¶22 Mother's counsel also questioned Caseworker 1 about why the Children weren't placed with Grandparents. Caseworker 1 responded that the Children were not placed with Grandparents because "[t]here were some things on [Step-Grandfather's] background check that [DCFS] just could not look at them being a placement." When asked if she remembered what was troubling about Step-Grandfather's background check, Caseworker 1 answered, "I don't, no. Usually I look at those, and once it's not acceptable for our agency, it – you know, that's pretty much it for me."

---

7. The supervised visits occurred at either a DCFS office or a park, but the DCFS caseworkers periodically made visits to Mother's home.

¶23 The guardian ad litem (the GAL) assigned to the Children also cross-examined Caseworker 1. When the GAL asked if Mother took responsibility for her drug use, Caseworker 1 responded that although Mother "was always very apologetic," she didn't "follow through" or "do what we asked." Caseworker 1 said that Mother had "a tendency to blame other people for [her] problems." And when asked about Mother's drug testing, Caseworker 1 said that it "went in waves," where Mother would "do really well for a while" but then "wouldn't do well for a while."

¶24 The State also proffered testimony from a second DCFS caseworker (Caseworker 2). Caseworker 2 had worked with the family from December 2020 through the termination hearing in November 2021. She would have testified that she attempted to take Mother to the inpatient treatment facility in December 2020, that Mother tested positive for methamphetamine when they arrived at the facility, and that, for "unclear" reasons, Mother ultimately refused to stay at the facility. Caseworker 2 also would have testified that later in December 2020, Mother entered an inpatient program but left after two days. And she would have testified about attempts to place the Children with relatives, the supervised visits, and Mother's efforts to comply with the plan. She also would have explained how Mother's youngest child, A.W., was placed in DCFS custody due to Mother's failed drug tests. Caseworker 2 would have further testified that Mother entered an inpatient treatment facility in May 2021, that Mother had plans to move in with Grandmother after she left the program because the alleged father is one of her "triggers," but that after leaving the program, Mother almost immediately moved back in with the alleged father.[8]

---

8. Grandmother, whose testimony was offered via proffer, would have testified that Mother had planned to move in with her after

(continued…)

¶25 During her cross-examination, Caseworker 2 acknowledged that Mother "interact[s] very well" with the Children and described her behavior during the supervised visits as "appropriate." Caseworker 2 also acknowledged that in the times she had been inside Mother's home, she had never "seen any sign of drug use or paraphernalia." But when the GAL asked if the Children could "be safely returned to the home today," Caseworker 2 replied, "No." And when asked if Mother was "a good and appropriate parent" "but for" her drug use, Caseworker 2 responded, "I don't like the term good parent, bad parent. I think it's too subjective. But I think in answer to that, I would say she is an appropriate parent. I think she's a parent with issues, but she tries her best."

¶26 Foster Mother testified next. Foster Mother explained that she and her husband started fostering N.W. in April 2020 and J.W. and B.W. in May 2020. Foster Mother described the Children as her "whole world" and testified that she and her husband were willing to adopt the Children.

¶27 Foster Mother then spoke about each individual child. She said that B.W., for example, is "enrolled in early intervention" with" PrimeTime 4 Kids and "receives speech and language therapy."[9] And she said that J.W. also does PrimeTime 4 Kids, but that he doesn't have any "physical limitations or medical needs." Foster Mother also explained that N.W. has a rare chromosomal syndrome. When N.W. first came into their home, he was on

---

leaving the inpatient treatment facility, that there was room for Mother to move in, but that Mother never came to live with her.

9. "PrimeTime 4 Kids is an early intervention program serving children 0–2 and their families. . . . Early intervention is a federally mandated program that is established to help children 0–2 with developmental disabilities." PrimeTime 4 Kids, https://primetime4kids.org/ [https://perma.cc/HC8T-U7GF].

"supplemental oxygen 24 hours a day" and had a G-tube to help with feeding, which required daily cleaning. She further testified that N.W.'s chromosomal syndrome has caused developmental delays and that he will "remain delayed." On cross-examination, she discussed how she and her husband "did a lot of research" into the syndrome by watching YouTube videos and "lectures given by doctors."

¶28    After the State rested, Mother proffered the testimony of three witnesses: a clinical mental health counselor (Counselor) who worked with Mother at the inpatient treatment facility, Grandmother, and Mother. As had occurred with the State's witnesses, the three witnesses' testimonies were offered via proffer, and Grandmother and Mother were then subject to live cross-examination.[10]

¶29    Counselor would have testified that Mother entered the inpatient treatment facility in May 2021 and successfully completed the program in August 2021. She would have stated that "[o]ver the last four to five weeks of her treatment, [Mother] gave this program her all, attending all groups, individual sessions, case management appointments, et cetera." Counselor also would have explained that Mother gave "each assignment careful thought and consideration" and had "agreed to continue to work on learning parenting skills and how to improve her ability to manage her emotions in a healthy way." And Counselor would have testified that Mother "created a strong after care plan that included support from 12-step meetings, her religious community, and her ongoing therapists." After proffering Counselor's testimony, Mother's counsel clarified that Counselor and Mother had not been in contact since Mother left the facility.

---

10. The alleged father also testified, but his testimony was relevant to his asserted parental rights, which are not at issue in this appeal.

¶30 Mother proffered Grandmother's testimony next. Grandmother would have testified that Mother and B.W. lived with her until B.W. was six months old. Grandmother would have described Mother as a "phenomenal mother" who dedicated her time to teaching and loving the Children. She would have described how Mother took the Children to the doctor frequently. She would have also testified that "she's absolutely never known [Mother] to be high around her kids" and that she "didn't know much about the drug use when [Mother and the alleged father] were living with [Grandparents] because they were never high around the kids." Grandmother would have further explained that Mother had been working hard toward recovery and had been implementing what she learned in therapy.

¶31 Grandmother would have also testified about her attempts to have the Children placed with her and Step-Grandfather. She would have explained that they were denied placement because of the LIS cases against Step-Grandfather and "that they went through the appeal process," "but they were denied again." She would have testified that she and Step-Grandfather were "willing to work any safety plan requested by DCFS, including line-of-sight supervision any time" Step-Grandfather is around the Children. Grandmother would have also stated that Step-Grandfather was "willing to do a sexual behavioral risk assessment" and that "they would follow through with any treatment."

¶32 At this point, the court asked for clarification about when Grandparents had requested custody, and Mother's counsel provided a summary of when Grandparents had done so.[11] Mother's counsel further explained that DCFS denied placement with Grandparents because DCFS claimed there was "a substantiated sexual abuse allegation on the licensing database"

---

11. The juvenile court judge that presided over the termination hearing was new to the case.

that couldn't be overturned. She said that DCFS "would not provide any more details than that as to what their concerns were." When the court asked if Grandparents' placement request was denied each time, Mother's counsel stated that the requests were "denied," or, rather, "continued more often than denied outright."

¶33 Mother then proffered her testimony. Mother would have testified that "she loves her children very much and has worked very hard to be successful in this case." She would have testified that she promptly addressed all safety concerns that DCFS caseworkers had about her home, like getting a fire extinguisher. She would have also explained how she always took the Children to their doctors' appointments and how they were healthy and clean when they went into the State's custody. With respect to her drug use, she would have described her improvement since entering a treatment facility and how she's worked on implementing the skills she learned. Mother would have also acknowledged, however, that she was "not yet in active recovery." But Mother would have testified that "despite her substance abuse disorder, . . . she always kept the drugs out of her home" and that she never used "around the [Children] and never at the house."

¶34 During cross-examination, Mother acknowledged that she and the Twins' umbilical cords tested positive for methamphetamine when they were born. She also acknowledged that she tested positive for drugs while pregnant with A.W. And Mother confirmed that since leaving the inpatient treatment facility, she had three relapses and used methamphetamine five times. She further testified that she created a safety plan while in the treatment facility and that she did not follow that plan. And she testified that since leaving the treatment facility, she had not been in contact with her "after care" contacts.

¶35 After closing arguments from all parties, the court ruled from the bench that grounds for termination existed and that it was in the Children's best interest to terminate both parents' parental rights. The court later issued written findings of fact and conclusions of law detailing its findings. There, the court found that Mother "struggled with drug testing and maintaining [her] sobriety throughout the entirety of the case." The court then made extensive findings about Mother's drug use, including a finding that "in 2020, Mother had 36 missed call-ins, 19 missed tests, 5 tests that were positive for methamphetamine[,] including on dates when she would have been pregnant with A.W., 1 test that was positive for alcohol, 1 test that was positive for THC[,] and 1 diluted test." The court further found that in January 2021, "Mother had 4 missed call-ins and 1 missed test"; that in February 2021, Mother had "perfect testing compliance"; that in March 2021, "Mother missed 1 test"; and that in April 2021, "Mother failed to test on 4 occasions, failed to call in on 2 occasions, and tested positive for methamphetamine" on one occasion. Relatedly, the court found that Mother "quickly relapsed" after leaving the inpatient treatment facility and that, by her own testimony, "she had 3 relapses and 5 methamphetamine uses in the short two months' time from leaving treatment to the date of trial."

¶36 The court also concluded that "Mother's attendance at therapy up until April of 2021 can be described as inconsistent at best." In particular, the court noted DCFS's attempts to help Mother get into an inpatient treatment facility and Mother's initial resistance to inpatient treatment.

¶37 The court also made findings about Mother's efforts and progress. It found that "by all accounts," Mother did well at the inpatient treatment facility and "gave the program her all, attended all groups, individual sessions and case management meetings and that she excelled in her program and appeared to grow in her confidence and sobriety." The court also found that

"Mother completed a parenting class, consistently participated in family team meetings, kept in regular contact with DCFS, allowed DCFS to conduct home visits, obtained proper housing, attended visits with the [Children], and completed some adult education classes." And the court concluded "that Mother appears to have good parental instincts and was always appropriate and attentive during visits with the [Children]." The court also stated that it was "very clear" that Mother "love[s] the [Children] very much."

¶38    The court then addressed whether DCFS made "reasonable efforts" to provide reunification services. *See* Utah Code Ann. § 80-4-301(3)(a) (LexisNexis Supp. 2022).[12] The court concluded that DCFS did make reasonable efforts, such as "holding regular family team meetings, completing regular home visits," helping Mother get into a treatment facility, and providing transportation. The court also noted that Mother never argued that DCFS failed to make reasonable efforts. And the court pointed out that because Mother was provided reunification services for A.W., she was "afforded an opportunity to take full advantage of these 'additional' services and 'additional' time to remedy the safety concerns that brought the [Children]" into DCFS custody.

¶39    Having made these findings, the court then engaged in the two-part inquiry for termination of parental rights, determining (1) whether a statutory ground for termination exists and, (2) if so, whether termination is in the best interest of the child. *See In re B.T.B.*, 2020 UT 60, ¶ 62, 472 P.3d 827.

¶40    On the question of whether grounds for termination existed, the court determined that four separate grounds existed:

---

12. Because there have been no material changes to the relevant statutory provisions, we cite the current version unless otherwise noted.

- First, the court found that Mother's use of illegal drugs "constituted abuse and neglect of the [Children]." *See* Utah Code Ann. § 80-4-301(1)(b) (listing "that the parent has abused or neglected the child" as a ground for termination). In support of this, the court relied on Mother's drug use while pregnant and her "ongoing continued use of methamphetamines."

- Second, the court found that Mother was an unfit parent because her "habitual use of methamphetamines and inability to maintain sobriety for any significant amount of time during the pendency of this matter render[s] [her] unable to properly care for the [Children]." *See id.* § 80-4-301(1)(c) (listing "that the parent is unfit or incompetent" as a ground for termination).

- Third, the court found that the Children "are being cared for in an out-of-home placement under the supervision of the juvenile court," Mother is "either unwilling or unable to remedy the circumstances that caused the [Children] to be in an out-of-home placement notwithstanding reasonable and appropriate reunification efforts by DCFS, and there is a substantial likelihood that Mother . . . will not be capable of exercising proper and effective parental care in the near future." *See id.* § 80-4-301(1)(d)(i) (listing a ground for termination applicable when children are "being cared for in an out-of-home placement under the supervision of the juvenile court"). Relevant here, the court found that despite nearly two years of reunification services, Mother was "still in active methamphetamine addiction and use, which is the entire reason the [Children] were placed in DCFS custody to begin with." The court further found that "more than a year after subjecting the [Twins] to fetal exposure of methamphetamines, Mother did the same thing to yet another child, all while participating in reunification services with DCFS."

- Fourth, the court found that Mother "demonstrated a failure of parental adjustment." *See id.* § 80-4-301(1)(e) (listing "failure of parental adjustment" as a ground for termination"); *id.* § 80-4-102(2) (defining "failure of parental adjustment"). Here, the court again relied on its conclusion that "with respect to Mother's . . . methamphetamine addiction, very little if any progress has been made."

¶41 Because it found that grounds for termination existed, the court then moved to the question of whether termination of Mother's parental rights was in the Children's best interest. As part of this analysis, the court considered whether "efforts to place the child with kin who have, or are willing to come forward to care for the child, were given due weight." (Quoting Utah Code Ann. § 80-4-104(12)(b)(ii) (LexisNexis Supp. 2022).) The court concluded that efforts to place the Children with kin were given due weight. With respect to Grandparents, the court stated that Step-Grandfather "did not pass the DCFS background check and, as a result, [Grandparents'] request for placement was denied." It further explained that the "denial was administratively appealed" and that Grandparents lost the appeal. And it finally noted that when Mother asked the court to "waive the failed background check" and place the Children with Grandparents anyway, the court "denied this request after considering all of the information and argument from the parties." The court accordingly concluded that "due weight" had been given to efforts to place the Children with Grandparents but that the placement "did not occur due to [Step-Grandfather] failing his background check."[13]

---

13. The court also found that "one of Mother's cousins expressed a desire to have the [Children] placed with her; however, the cousin never filled out the required background check." Mother has not challenged this aspect of the court's ruling.

¶42 The court then considered whether termination was "strictly necessary" to promote the Children's best interest. *See* Utah Code Ann. § 80-4-104(12)(b) (LexisNexis Supp. 2022); *see also In re B.T.B.*, 2020 UT 60, ¶ 66. On this, the court made several findings about the Children's relationship with their foster parents, including:

- The Twins "have been with the foster parents nearly their entire lives and [B.W.] for nearly half of his young life."

- The Children "have thrived in the care of the foster parents. [B.W.] has made great strides in his speech through regularly working with a speech therapist. [N.W.] has an extremely rare condition . . . which results in many developmental delays and requires extra precautions and care. The foster parents have spent many hours researching the condition and how they can best care for [N.W.]"

- The Children "have formed a strong familial bond with the foster parents and look to the foster parents as their natural parents."

- "The foster parents have treated the [Children] as their own and have tailored their lives so that one of their primary objectives is to provide for the needs and safety of the [Children]."

- "The [Children's] sibling, A.W.[,] is also in the care of the foster parents."

¶43 Based on these findings, the court concluded that "it is clearly in the [Children's] best interests to have parental rights terminated so that they may be adopted." The court further explained, "Given the young age of the [Children] and the amount of time they have been in the home of the foster parents in relation to their young ages, it is strictly necessary to terminate parental rights so the [Children] may be adopted and receive the

permanency they deserve." The court thus terminated Mother's parental rights in the Children. Mother now appeals.

ISSUES AND STANDARDS OF REVIEW

¶44 Mother first challenges the juvenile court's determination that grounds for termination existed. She next challenges the juvenile court's best interest determination, arguing that the court erred when it "failed to require clear and convincing evidence to preclude a kinship placement with Grandmother" and "concluded that it was strictly necessary to terminate Mother's parental rights."

¶45 "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re E.R.*, 2021 UT 36, ¶ 7, 496 P.3d 58 (quotation simplified). We will thus overturn a juvenile court's termination decision only if "it is against the clear weight of the evidence or leaves [us] with a firm and definite conviction that a mistake has been made." *Id.* (quotation simplified). Put differently, we will overturn a termination decision only if the juvenile court "either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *Id.* (quotation simplified); *see also id.* ¶ 12.

ANALYSIS

¶46 In the Termination of Parental Rights Act (the Act), our legislature set forth two findings that a juvenile court must make before terminating parental rights. *See* Utah Code Ann. § 80-4-103(2)(c) (LexisNexis Supp. 2022); *see also In re B.T.B.*, 2020 UT 60, ¶ 46, 472 P.3d 827. First, the juvenile court must find that at least one ground for termination exists under Utah Code section 80-4-301. *See In re B.T.B.*, 2020 UT 60, ¶ 46; *In re J.M.*, 2020 UT App 52, ¶ 30, 463 P.3d 66. Second, the court must find that

termination is in the best interest of the child. *See In re B.T.B.*, 2020 UT 60, ¶ 46. Both findings must be supported by clear and convincing evidence. *See* Utah Code Ann. § 80-4-103(2)(a); *In re B.T.B.*, 2020 UT 60, ¶ 48.

¶47 In this case, the court terminated Mother's parental rights in the Children after finding that four grounds for termination existed and that termination was in the Children's best interest. Mother challenges both parts of that ruling.

## I. Grounds for Termination

¶48 Utah Code section 80-4-301 lists several possible grounds for terminating parental rights. The juvenile court found that four of them existed with respect to Mother: "that the parent has neglected or abused the child," Utah Code Ann. § 80-4-301(1)(b) (LexisNexis Supp. 2022); "that the parent is unfit or incompetent," *id.* § 80-4-301(1)(c); "that the child is being cared for in an out-of-home placement" and additional requirements have been met, *id.* § 80-4-301(1)(d)(i); and "failure of parental adjustment," *id.* § 80-4-301(1)(e).

¶49 Mother challenges the court's finding of each ground, contending that there wasn't clear and convincing evidence to support any of them. But we conclude that the evidence was sufficient with respect to at least one of the grounds—failure of parental adjustment—and we accordingly reject Mother's argument. *See In re J.M.*, 2020 UT App 52, ¶ 30 (explaining "that the presence of a single statutory ground is sufficient to fulfill the first element of the termination test").[14]

---

14. The juvenile court found that DCFS made reasonable efforts to return the Children to Mother. It also found that Mother received "'additional' services and 'additional' time" due to A.W.'s birth. Mother did not challenge those findings below or on appeal.

¶50 As defined by the Act, failure of parental adjustment "means that a parent or parents are unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by the division to return the child to the home." Utah Code Ann. § 80-4-102(2) (LexisNexis Supp. 2022). Here, the juvenile court found that Mother demonstrated a failure of parental adjustment because, although she made "significant progress with a number of requirements on the child and family plan, [she was] still in active methamphetamine addiction and use, which is the entire reason the [Children] were placed in DCFS custody to begin with." The court particularly focused on Mother's testimony that she used methamphetamine while pregnant with A.W. and that "in the two months leading up to trial, she used methamphetamine on five occasions."

¶51 After reviewing the record, we cannot conclude that the court's finding that Mother demonstrated a failure of parental adjustment went "against the clear weight of the evidence." *In re E.R.*, 2021 UT 36, ¶ 7, 496 P.3d 58 (quotation simplified). As explained, DCFS filed a petition for protective supervision services a few weeks after the Twins' birth, after the Twins' umbilical cords tested positive for methamphetamine and amphetamine. The juvenile court granted the petition, adjudicated the Children as abused and neglected, and ordered Mother to submit to drug testing as part of a child and family plan. Two months later, the court removed the Children from Mother and placed them in DCFS custody because Mother missed drug tests and tested positive for methamphetamine.

¶52 Again, this ground looks to whether the parent was able to "substantially correct" the "conduct" or "conditions that led to placement of [the] child outside of their home." Utah Code Ann. § 80-4-102(2). So here, since the Children had been removed from the home because of Mother's positive and missed drug tests, the

question before the court was whether Mother had "substantially corrected" that behavior between their removal in April 2020 and the termination hearing in November 2021.

¶53    The record supports the court's conclusion that Mother hadn't. Indeed, the record shows that up through the termination hearing, Mother continued to struggle with drug testing and drug use. As the court found, "in 2020, Mother had 36 missed call-ins, 19 missed tests, 5 tests that were positive for methamphetamine[,] including on dates when she would have been pregnant with A.W., 1 test that was positive for alcohol, 1 test that was positive for THC[,] and 1 diluted test." From January to March 2021, Mother had 4 missed call-ins and 2 missed tests. "In April 2021, Mother failed to test on 4 occasions, failed to call in on two occasions, and tested positive for methamphetamine" once. From May to August 2021, Mother was in the inpatient treatment facility, where she reportedly did very well. But upon leaving the facility, Mother "almost immediately returned" to live with the alleged father and "very quickly relapsed on methamphetamine." Indeed, in "the short two months' time from leaving treatment to the date of trial," Mother "had 3 relapses and 5 methamphetamine uses." Mother has not challenged these findings, and they support a finding that Mother was "unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of [the Children] outside of [her] home." *Id.*

¶54    Mother nevertheless argues that the court improperly took a "'zero-tolerance' approach" and failed "to in any way take into account Mother's efforts and progress." But the court didn't take a zero-tolerance approach. Rather, the court concluded that Mother was unable or unwilling to substantially correct her drug use after making findings about Mother's *repeated* use of methamphetamine, including specific findings about her use while pregnant and again in the few months between her inpatient treatment and the termination hearing. The court also

didn't fail to "take into account Mother's efforts and progress." In its order, the court acknowledged that Mother had "made significant progress with a number of requirements on the child and family plan" and that Mother had "successfully completed" the inpatient treatment program. But the court then found that Mother "very quickly relapsed on methamphetamine" after leaving the facility and that Mother was still "in active methamphetamine addiction and use." In short, the court recognized Mother's progress, but it nevertheless found that even with this progress, her ongoing methamphetamine use still demonstrated that she was either unwilling or unable to substantially correct her drug use.

¶55 Mother also argues that she didn't "willfully refuse to deal with her drug issue, but rather really tried to stay clean." But a court can find failure of parental adjustment based on a parent's unwillingness *or* inability to "substantially correct the circumstances, conduct, or conditions that led to placement of [the] child outside of their home." *Id.* In this sense, a parent's unsuccessful efforts, even if sincere, might not be sufficient to prevent a finding of failure of parental adjustment if the behavior that led to the child's removal is not substantially corrected. *See id.* As explained, the court's finding that Mother was either unwilling or unable to substantially correct her drug use does not go against the clear weight of the evidence, given that Mother continued to miss tests and continued to test positive even while benefiting from reunification services, and given that she "very quickly relapsed on methamphetamine" after spending over three months at an inpatient treatment facility. In short, the evidence showed that Mother either could not stop using drugs because of addiction, in which case she was *unable* to substantially correct the behavior, or that she was choosing to not stop using drugs, in which case she was *unwilling*. Either way, the court's finding did not go against the clear weight of the evidence.

¶56    Lastly, Mother contends that her relapses "should only be disqualifying if the relapse renders her incapable of taking care of her children." For this proposition, Mother cites Utah Code subsection 80-4-302(2)(c), which states, "In determining whether a parent or parents are unfit or have neglected a child the juvenile court shall consider: . . . habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render the parent unable to care for the child. . . ." *See id.* § 80-4-302(2)(c) (LexisNexis Supp. 2022). According to Mother, the court was only allowed to ground its termination decision in her drug use if it made specific findings that the drug use made her "unable to care" for the Children. *See id.*

¶57    But we have previously stated that the considerations listed under subsection 80-4-302(2) "apply to two specific grounds for termination under subsection [80-4-301(1)]—whether a parent is 'unfit or incompetent' pursuant to subsection [80-4-301(1)(c)], and whether a parent 'has neglected or abused the child' pursuant to subsection [80-4-301(1)(b)]." *In re L.A.*, 2017 UT App 131, ¶ 33, 402 P.3d 69. This is because the statute only requires the juvenile court to take the listed considerations into account "[i]n determining whether a parent or parents are *unfit or have neglected a child*." Utah Code Ann. § 80-4-302(2) (emphasis added). So under our controlling precedent, subsection 80-4-302(2) is inapplicable to the ground for termination at issue here, which is failure of parental adjustment. The court was thus not required to consider whether Mother's drug use rendered her "unable to care for" the Children, and we need not consider Mother's argument on that point. *See id.; see also In re L.A.*, 2017 UT App 131, ¶ 33.

¶58    In short, there was sufficient evidence of Mother's ongoing drug use, thereby also supporting the court's finding that Mother was "unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of [the Children] outside of their home." Utah Code Ann. § 80-4-102(2). We are thus unconvinced that the

court "failed to consider all of the facts" or that the court's decision was "against the clear weight of the evidence." *In re E.R.*, 2021 UT 36, ¶ 7 (quotation simplified).

## II. Best Interest

¶59 After finding that grounds for termination existed, the juvenile court determined that termination of Mother's parental rights and adoption by the foster family was in the Children's best interest. On appeal, Mother argues that there was not clear and convincing evidence that termination of Mother's parental rights, as opposed to placement with Grandparents, was in the Children's best interest. Relatedly, she asks us to "remand with instructions to the juvenile court to consider the viability of guardianship or other custodial arrangements with Grandmother." We decline this request and instead affirm the juvenile court's best interest determination.[15]

¶60 If a juvenile court determines that grounds for termination exist, the court must then consider whether termination is in the child's best interest. *See In re B.T.B.*, 2020 UT 60, ¶ 46; *see also* Utah Code Ann. § 80-4-103(2)(c) (explaining that a court should

---

15. In her briefing, Mother seems to separately argue that the Children should have been placed with Grandmother alone, even if Step-Grandfather was not a good placement option. But the court's order, as well as minute entries from prior hearings, indicate that Mother and Grandparents collectively requested that the court place the Children with Grandmother and Step-Grandfather together. Regardless, even if the request was that the Children be placed with only Grandmother, it was still appropriate for the court to consider Step-Grandfather's background since he lived with Grandmother. *Cf. In re J.P.*, 2021 UT App 134, ¶¶ 11, 20–23, 502 P.3d 1247 (affirming a juvenile court's determination that a placement was inappropriate where one member of the household had a "history of violence").

"consider the welfare and best interest of the child of paramount importance in determining whether to terminate parental rights"). This consideration should be directed by "two related pieces of important guidance" provided by our legislature. *In re J.J.W.*, 2022 UT App 116, ¶ 27.

¶61 First, "[a] child's need for a normal family life in a permanent home, and for positive, nurturing family relationships is usually best met by the child's natural parents." Utah Code Ann. § 80-4-104(8) (LexisNexis Supp. 2022). There is accordingly "a strong preference for families to remain together." *In re J.J.W.*, 2022 UT App 116, ¶ 27. Second, a court should terminate parental rights only when doing so is "strictly necessary" "from the child's point of view." Utah Code Ann. § 80-4-301(1); *see also In re J.J.W.*, 2022 UT App 116, ¶ 28. Put differently, "termination must be strictly necessary to promote the child's best interest." *In re B.T.B.*, 2020 UT 60, ¶ 60. Because this analysis occurs "from the child's point of view," "the court's focus should be firmly fixed on finding the outcome that best secures the child's well-being." *Id.* ¶ 64.

¶62 When considering whether termination is strictly necessary, a juvenile court must consider, "among other relevant factors," whether "efforts to place the child with kin who have, or are willing to come forward to care for the child, were given due weight." Utah Code Ann. § 80-4-104(12)(b)(ii). Our supreme court has clarified that

> this part of the inquiry also requires courts to explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating parental rights. In some cases, alternatives will be few and unsatisfactory, and termination of the parent's rights will be the option that is in the child's best

> interest. But in other cases, courts should consider whether other less-permanent arrangements might serve the child's needs just as well.

*In re B.T.B.*, 2020 UT 60, ¶ 67 (quotation simplified).[16]

¶63 Two of our recent cases shed light on how a court should consider kinship placements: *In re A.H.*, 2022 UT App 114, 518 P.3d 993, and *In re J.J.W.*, 2022 UT App 116.

¶64 In the first case, the State moved to terminate the rights of a mother and father to their seven children. *In re A.H.*, 2022 UT App 114, ¶ 16. The juvenile court did not terminate the parents' rights in the oldest five children, and those children were placed with their grandparents "under an order of permanent custody and guardianship." *Id.* ¶ 21. But the court did terminate the parents' rights in the youngest two children, and the court did so even though the grandparents were willing and able to care for those younger children. *See id.* ¶¶ 26, 29. The court's decision regarding the younger children was based on its finding that it was in their best interest to be adopted by their foster family. *Id.* ¶ 29. We reversed on appeal, however, concluding "that the juvenile court's best-interest determination was against the clear weight of the evidence presented at trial." *Id.* ¶ 57. We did so because there was not clear and convincing evidence that terminating the parents' rights in the younger children "was strictly necessary, especially given the presence of another available and acceptable option—permanent guardianship with [the grandparents], alongside their five siblings—that would not

---

16. Our supreme court was writing generally about the strict necessity requirement and not specifically about the kinship inquiry. But we take its analysis to apply to the kinship inquiry, which is, after all, a part of strict necessity. *See In re J.J.W.*, 2022 UT App 116, ¶ 29 (applying this language to the kinship inquiry); *In re A.H.*, 2022 UT App 114, ¶ 37, 518 P.3d 993 (same).

require permanent severance of familial bonds and that would serve the [younger children's] best interest at least as well as adoption." *Id.*

¶65   In the second case, a district court terminated a father's parental rights after determining that it was in the child's best interest to be adopted by his grandparents. *In re J.J.W.*, 2022 UT App 116, ¶¶ 13, 16. On appeal, we held that the "court fell into legal error when it failed to expressly consider other apparent reasonable options short of termination that might serve [the child's] best interest just as well." *Id.* ¶ 37. More specifically, we concluded that "the court erred by failing to explain, on the record, why a permanent custody and guardianship arrangement" with the child's grandparents "could not serve [the child's] best interest, and why termination of [the father's] parental rights—as opposed to imposition of a guardianship— was strictly necessary to further that interest." *Id.* We accordingly vacated the termination order and remanded "the case for a renewed best-interest analysis." *Id.*

¶66   From our review of these cases and the statutes that they interpreted, three principles emerge that matter here.

¶67   First, courts have an obligation to consider proposed kinship placements, and if a court rejects a kinship placement, it must give reasons on the record for doing so. *See id.* ¶ 32 (faulting a court for rejecting a kinship placement without explaining "why it rejected that option"); *see also In re A.H.*, 2022 UT App 114, ¶ 37 ("Courts that order termination of parental rights without appropriately exploring feasible alternatives to termination have not properly applied the second part of the two-part termination test." (quotation simplified)); *In re B.T.B.*, 2020 UT 60, ¶ 74 (explaining that strict necessity "requires the court to find, on the record, that no other option can achieve the same welfare and best interest for the child" as termination).

¶68     Second, although there's a statutory preference for kinship placements, and although courts must appropriately explore kinship placements as a result, courts that explore such options may then conclude, on the facts before them, that a different option is in fact in a child's best interest. *See In re A.H.*, 2022 UT App 114, ¶ 37 ("In some cases, alternatives will be few and unsatisfactory, and termination of the parent's rights will be the option that is in the child's best interest." (quotation simplified)); *see also In re J.J.W.*, 2022 UT App 116, ¶ 29 (same). On this, *In re A.H.* stands as something of an illustrative contrast. There, we explained that if "a completely appropriate kinship placement" exists, it "becomes significantly more difficult" to show that termination is strictly necessary. 2022 UT App 114, ¶ 49. And we accordingly reversed in that case because there were "no concerns" with the proposed kinship placement and there was accordingly not clear and convincing evidence that termination was strictly necessary. *Id.* ¶¶ 50, 57. But if a case presents itself in which a court does appropriately consider the proposed kinship options and yet concludes that those options are not completely appropriate based on valid concerns, the court could then reject the proposed kinship placement and find that termination is strictly necessary. *See id.* ¶ 37; *see also In re B.T.B.*, 2020 UT 60, ¶ 66; *In re J.J.W.*, 2022 UT App 116, ¶ 29.

¶69     Third, if a court has complied with its statutory obligations, its resultant best interest determination is entitled to deference. *See In re J.J.W.*, 2022 UT App 116, ¶ 18; *see also In re E.R.*, 2021 UT 36, ¶ 22. This is because the best interest determination "is a factually intense inquiry dependent on the unique circumstances and needs of each child." *In re E.R.*, 2021 UT 36, ¶ 22 (quotation simplified). Furthermore, "the juvenile court has a superior perspective in light of its view of the demeanor of both parents and children." *Id.* ¶ 23. For these reasons, "we do not lightly reverse a court's best-interests determination." *In re A.H.*, 2022 UT App 114, ¶ 38. But to be clear, a juvenile court's determinations are not "afforded a high degree of deference"; rather, "the

deference afforded to the juvenile court is the same level of deference given to all lower court findings of fact and fact-like determinations of mixed questions." *In re E.R.*, 2021 UT 36, ¶¶ 29–30. Accordingly, we will overturn a juvenile court's decision "if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *Id.* ¶ 31 (quotation simplified). In *In re J.J.W.*, for example, we remanded because the district court failed to consider whether a kinship placement could serve the child's best interest. 2022 UT App 116, ¶ 37. And in *In re A.H.*, we reversed where the juvenile court did consider the kinship placement but its decision went "against the clear weight of the evidence presented at trial." 2022 UT App 114, ¶ 57.

¶70 With these principles in mind, we review the juvenile court's best interest determination in this case and affirm.

¶71 First, unlike what occurred in *In re J.J.W.*, the court here did "consider" and "discuss" the possibility of a kinship placement (namely, one with Grandparents). *See* 2022 UT App 116, ¶ 31. When Mother first requested that the Children be placed with Grandparents, the court denied that request because Step-Grandfather could not pass a background check. But the minutes for the hearing indicate that the court planned to "continue to work on placement clearance of" Grandparents. And the minutes from later hearings indicate that placement with Grandparents continued to be a topic of discussion among the parties and the court. Notably, the parties informed the court that although Step-Grandfather was able to get three of his LIS cases overturned, two could not be overturned because of their significance. In its termination order, the court documented this history, explaining that Step-Grandfather "did not pass the DCFS background check and, as a result, [Grandparents'] request for placement was denied." The court explained further: "The denial was administratively appealed, which [Grandparents] lost. Thereafter, Mother . . . asked the Court to waive the failed background check

and place the [Children] in [Grandparents'] direct custody. The Court denied this request after considering all of the information and argument from the parties." And it later concluded that "due weight was given to possible kin placements, but they did not occur due to [Step-Grandfather] failing his background check."

¶72 Despite all this, Mother argues that the court's consideration was inadequate because the court did not further consider Grandparents' apparent willingness to comply with a safety plan and Step-Grandfather's offer to complete a sexual behavioral risk assessment. Relatedly, Mother points out "that Step-Grandfather worked out of the house six days a week" and thus claims "that his presence in Grandmother's household would therefore be minimal." But there is nothing in the record to suggest that the court didn't consider this information. Rather, the record indicates that the court considered it but still concluded that Grandparents were an inappropriate placement given the import of Step-Grandfather's LIS cases and background.

¶73 In short, the juvenile court repeatedly considered the possibility of placing the Children with Grandparents. It is thus clear to us that the court fully complied with its obligation to "appropriately explor[e]" whether they were an appropriate placement option. *See In re A.H.*, 2022 UT App 114, ¶ 37.

¶74 Second, unlike what occurred in *In re A.H.*, there were valid concerns in this case with Grandparents. *See id.* ¶ 50 (explaining that there were "no concerns" with the grandparents and that the juvenile court even found that they were "certainly appropriate caregivers"). As explained above, the juvenile court rejected Grandparents as a placement option because Step-Grandfather could not pass the DCFS background check due to his cases in the LIS. We see no basis for invalidating the court's conclusion about the import of Step-Grandfather's background.

¶75 If DCFS "makes a supported finding that a person committed a severe type of child abuse or neglect," it enters "the

name and other identifying information of the perpetrator with the supported finding" into the LIS. Utah Code Ann. § 62A-4a-1005(1)(b)(i) (LexisNexis Supp. 2021). A "supported finding" "means a finding by [DCFS] based on the evidence available at the completion of an investigation that there is a reasonable basis to conclude that abuse, neglect, or dependency occurred." *Id.* § 62A-4a-101(42). If the alleged perpetrator is "18 years of age or older," then "severe type of child abuse or neglect" means "chronic abuse," "severe abuse," "sexual abuse," "sexual exploitation," "abandonment," "chronic neglect," or "severe neglect." *Id.* § 62A-4a-1002(1)(i) (2018). If the alleged perpetrator is "under the age of 18," then "severe type of child abuse or neglect" means "serious physical injury, as defined in Subsection 76-5-109(1), to another child which indicates a significant risk to other children" or "sexual behavior with or upon another child which indicates a significant risk to other children." *Id.* § 62A-4a-1002(1)(ii).[17]

¶76   As part of this process, DCFS must "serve notice of the finding on the alleged perpetrator." *Id.* § 62A-4a-1005(1)(a) (Supp. 2021). The alleged perpetrator may then "file a written request asking [DCFS] to review the findings made," "immediately petition the juvenile court under Section 80-3-404," or "sign a written consent to . . . the supported finding" and entry in the LIS. *Id.* § 62A-4a-1005(3)(a). DCFS must remove an alleged perpetrator's name and information from LIS "if the severe type of child abuse or neglect upon which the [LIS] entry was based: (A) is found to be unsubstantiated or without merit by the juvenile court under Section 80-3-404; or (B) is found to be substantiated, but is subsequently reversed on appeal." *Id.* § 62A-4a-1005(e)(i). A finding is "substantiated" if a juvenile court determines "based on

---

17. Section 62A-4a-1002 has been repealed. *See In re A.C.*, 2022 UT App 121, ¶ 6 n.6. The definition of "severe type of child abuse or neglect" can now be found in Utah Code section 80-1-102(78)(a) (LexisNexis Supp. 2022).

a preponderance of the evidence that abuse or neglect occurred." *Id.* § 62A-4a-101(40).

¶77 Mother is correct that the record does not include the underlying facts of the LIS cases, and it may have been helpful for the analyses of both the juvenile court and our court if such information had been provided below. Nevertheless, the record is still sufficiently clear on several key things. One is that Step-Grandfather at one point had five cases in the LIS. These cases would have necessarily required a finding from DCFS that Step-Grandfather committed "a severe type of child abuse or neglect." *Id.* § 62A-4a-1005(1). Another is that DCFS made efforts to help Step-Grandfather get the cases overturned, that three of the cases were overturned, but that two cases were still upheld because they were "of such significance that they cannot be overturned."[18] And finally, Grandmother's proffered testimony was that there "was a successful reunification" in at least one of those cases, which meant that, whatever it was, the conduct at issue was serious enough that Step-Grandfather's own children had been removed from his custody at some point.

¶78 We simply cannot fault the juvenile court for finding that it was not in the Children's best interest to be placed in a home with somebody who, despite having tried to be removed from the LIS, nevertheless remained in the LIS based on two prior cases that were "of such significance that they cannot be overturned." *See In re J.P.*, 2021 UT App 134, ¶¶ 11, 20–23, 502 P.3d 1247 (upholding a juvenile court's determination that placement with relatives was inappropriate where one member of the household had a "history of violence"). Indeed, beyond the obvious safety

---

18. The State claimed that one of the cases involved sexual abuse, but Grandmother would have testified that the cases were "not . . . for any form of sexual abuse." Our resolution of this issue does not turn on whether the cases involved sexual abuse, so we need not resolve this dispute.

concerns raised by the LIS cases, we further note some legislative support for the court's assessment of their significance to the question before it. By statute, a person who is listed in the LIS "may be disqualified from adopting a child, receiving state funds as a child care provider, or being licensed by" DCFS. Utah Code Ann. § 62A-4a-1005(2)(a)(v). While Mother points out that a kinship placement is not precisely the same thing as an adoption or being licensed by DCFS, this statute still evidences the legislature's conclusion that placement on the LIS should result in some restriction of a person's ability to have sustained access to children. Given this, we don't see why a juvenile court couldn't likewise conclude that there is good reason to not place children in the care of someone who is listed in the LIS.

¶79 Mother nevertheless contends that the facts underlying the LIS cases could have been fairly benign and therefore an invalid basis for not placing the Children with Grandparents. But if that were true, Step-Grandfather could have testified at the termination hearing, provided more information, and thus explained to the court himself why the LIS cases shouldn't preclude placement. But he didn't. Because of this, what the court was left with was that Step-Grandfather still had LIS cases that were based on a finding that he committed "a severe type of child abuse or neglect," and that almost eighteen months after learning that these cases could prevent placement, two of the cases were still in the LIS because of their significance. Given all this, we decline to fault the court for not delving deeper into evidence that Mother could have provided but didn't.[19]

---

19. At oral argument, Mother suggested that Step-Grandfather couldn't have testified about the cases because they happened long ago and "he didn't know" what the cases were about. If it were true that Step-Grandfather didn't remember the underlying facts of the cases, he could have requested information from

(continued…)

¶80 Third and finally, given the court's consideration of Grandparents and the information that it received throughout the proceedings and then noted in its order, we defer to its ultimate conclusion that although there was a potential kinship option, termination was in the Children's best interest. *See In re E.R.*, 2021 UT 36, ¶ 22. As explained above, DCFS found that Step-Grandfather committed "a severe type of child abuse or neglect" and that two of the cases could not be overturned because of their significance. Faced with those facts, the juvenile court could and indeed did validly conclude that placement with Grandparents would be "unsatisfactory," *In re B.T.B.*, 2020 UT 60, ¶ 67 (quotation simplified), and not "acceptable," *In re A.H.*, 2022 UT App 114, ¶ 49.

¶81 Having properly rejected the proposed kinship placement, the court then explained why adoption was in the Children's best interest. It found that the Children had "thrived in the care of the foster parents" and "formed a strong familial bond with the foster parents and look to the foster parents as their natural parents." The court also explained that N.W. has a rare chromosomal syndrome and that the foster parents have spent time researching the condition and learning how to best care for N.W. And with respect to the Children, the court found that the foster parents "treated [the Children] as their own" and "tailored their lives so that one of their primary objectives is to provide for the needs and safety of" the Children. These findings amply demonstrate that adoption by the foster parents was indeed a viable and positive option for the Children.

¶82 Given the findings detailed above, Mother has not persuaded us that the court "failed to consider all of the facts" or that it "considered all of the facts and its decision was nonetheless

---

DCFS. *See* Utah Code Ann. § 62A-4a-1006(4)(c)(ii)(B) (explaining that DCFS can access the LIS to "respond to a request for information from a person whose name is listed in" the LIS).

against the clear weight of the evidence." *In re E.R.*, 2021 UT 36, ¶ 7 (quotation simplified). We accordingly decline to disrupt the court's determination that it was in the Children's best interest to be adopted by their foster family and that termination of Mother's parental rights was strictly necessary to achieve that outcome.

## CONCLUSION

¶83    The court's finding that grounds for termination existed was not against the clear weight of the evidence, nor was its determination that terminating Mother's parental rights was strictly necessary to promote the Children's best interest. The decision below is accordingly affirmed.

——————————